UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Carolyn C. Jones,** §<br>*Plaintiff* §<br>§<br>v. §<br>§<br>**International Business Machines** §<br>**Corporation ("IBM"),** §<br>*Defendant* § | Case No. 1:19-cv-00251-RP |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

**TO: THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE**

Before the Court are Plaintiff's Motion for Summary Judgment (Dkt. 31) and Defendant's Motion for Summary Judgment (Dkt. 33), both filed May 18, 2020, and the associated response and reply briefs.[1] The District Court referred the motions to the undersigned Magistrate Judge for Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas ("Local Rules").

### I.  Background

This is a suit for benefits under the Employee Retirement Income Security Act of 1974 (ERISA). Plaintiff Carolyn C. Jones alleges that she took early retirement from Defendant International Business Machines Corporation ("IBM") after IBM's pension plan administrator told her that she would receive a lump sum pension benefit of more than $331,000. Dkt. 31 at 1. After Jones retired, however, she received a pension of only $53,477.51. *Id.*

---

[1] Plaintiff's Reply in Support of her Motion for Summary Judgment (Dkt. 38) was filed one week late. *See* Local Rule CV-7(f)(2).

Jones initially worked for IBM as a software engineer from June 1980 to December 1999. Dkt. 32 at 63, 65-66, Deposition of Plaintiff Carolyn C. Jones ("Jones Tr.") at 6:12-13, 10:14-11:2. She then took a lump sum payout of her accrued pension benefits, totaling approximately $89,000, and went to work for a startup technology company. *Id.* at 73, Jones. Tr. at 38:11-19; Dkt. 33-1 at 3-4, Jones Tr. at 13:23-14:8. After the startup failed, Jones returned to IBM in 2003, and again became a participant in IBM's pension plan. Dkt. 32 at 70, Jones Tr. at 18:8-13. IBM ceased contributing to its pension plan at the end of 2007, but the accounts continued to accrue interest. Dkt. 33-2 at 11, Deposition of former Plan Administrator William E. Carlough ("Carlough Tr.") at 63:4-18. IBM contracted with Fidelity Investments to manage certain administrative aspects of its pension plan and other employee benefits. Dkt. 33 at 5.

In 2014 or 2015, IBM and Fidelity became aware that, due to a software error, certain employees would receive an inaccurate pension calculation if, like Jones, they took pension payouts and then returned to IBM. Dkt. 33 at 5; *see also* Dkt. 32 at 5-7, 58. Such pension accounts

> were supposed to be flagged so that the employee could not generate online statements or receive mailed statements until that employee first contacted the Employee Service Center so that a manual calculation of their estimated lump sum benefit could be included with their statement. Unfortunately, this solution was not fool-proof and, even though her account should have been flagged, Jones was able to obtain an online lump sum benefit statement through Fidelity NetBenefits which included the inflated lump sum distribution amount.

Dkt. 33 at 6 (citing Carlough Tr. at 25:6-9, 29:20-25).

In May 2017, Jones became eligible, and was invited, to retire early through IBM's "Transition to Retirement" program. Dkt. 32 at 88-89 & Dkt. 33-1 at 16-17, Jones Tr. at 62:18-63:16. Under the program, employees reduce both their hours and salary for one year while they train their replacements, then retire. *See id*. Jones was approved for the program in June 2017, and her official retirement date was set for June 30, 2018. Dkt. 32 at 75 & Dkt. 33-1 at 13, Jones Tr. at 41:7-9.

2

Before she retired, Jones received the following pension reports stating her estimated lump sum payments as of that date:

- September 10, 2016 – $278,066.40. Dkt. 32 at 8.
- December 27, 2017 – $331,250.95. *Id.* at 10.
- January 29, 2018 – $331,250.95. *Id.* at 11-26.

There is no evidence that she received any other pension reports. In addition, Jones called IBM's Employee Service Center on February 22, 2018, and March 6, 2018, and spoke to members of IBM's "Retirement Coordination Team," who confirmed that the $331,250.95 figure was correct.[2] Jones also spoke with Fidelity Brokerage Services representative Michael Helal about her retirement plans. *See* Dkt. 33-1 at 8, 15, Jones Tr. at 26:9-16, 53:1-20.

After Jones retired and received a final calculation from the IBM Pension Administrator on July 4, 2018, stating that she would receive a lump sum distribution payment of only $53,477.71, she spoke with her primary retirement contact, Jessica Zucchi, who agreed that the amount "seems completely off to me" and said she would "reach out to our calculation team." Aug. 1, 2018 Call at 2:05-2:15; *see also* Dkt. 33-1 at 15, Jones Tr. at 53:10-20. On August 3, 2018, however, Jones was informed that the lower amount was correct. The same day, she filed a claim with the Plan Administrator, which was denied, then two appeals, which also were denied. *See* Dkt. 32 at 40-57.

Jones now sues for ERISA estoppel pursuant to 29 U.S.C. § 1132(a), asserting that she is entitled to the full lump sum distribution "that was promised to her." Dkt. 1 ¶ 51. She seeks an order directing IBM to pay her $277,773.24, equal to $331,250.95 minus the $53,477.71 lump sum benefit she has received, plus interest, costs, and attorneys' fees. *Id.* ¶ 53. Both parties now move for summary judgment.

---

[2] The parties submitted recordings of the phone calls referenced herein on flash drive and CD/DVD, respectively. *See* Dkt. 32 at 137-40; Dkt. 33-3.

3

## II.  Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Id.*

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate

the precise manner in which that evidence supports its claim. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

Where, as here, the parties have filed cross-motions for summary judgment, the Court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013)).

### III.  Analysis

Equitable estoppel is a traditional equitable remedy that "operates to place the person entitled to its benefit in the same position he would have been in had the representation been true." *Cigna Corp. v. Amara*, 563 U.S. 421, 433 (2011) (citation omitted).

Application of ERISA estoppel is a legal theory. *High v. E-Systems Inc.*, 459 F.3d 573, 579 (5th Cir. 2006). To prove equitable estoppel under ERISA, a plaintiff must establish (1) a material misrepresentation; (2) reasonable and detrimental reliance on the representation; and (3) extraordinary circumstances. *Mello v. Sara Lee Corp.*, 431 F.3d. 440, 444-45 (5th Cir. 2005); *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 374 (5th Cir. 2008). The Court considers each element in turn.

#### A.  Material Misrepresentation

As the Fifth Circuit has stated: "Plaintiffs are able to satisfy the material misrepresentation element if their employers misrepresented any pertinent information." *Mello*, 431 F.3d at 445. A misrepresentation is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." *Johnson v. United Healthcare of Texas, Inc.*, 167 F. Supp. 3d 825, 834 (W.D. Tex. 2016) (quoting *High v. E-Systems*, 459 F.3d at 579).

The record shows that the benefits statements Jones received misstated the amount of her lump sum payment. Here, as in *Mello*, 431 F.3d at 445, "[b]ecause there was a substantial likelihood that a reasonable employee would be misled about making adequately informed decisions by [defendant's] benefit statements' undisputed errors," the benefits statements were material misrepresentations. IBM does not concede, but also does not dispute, the first ERISA-estoppel element. *See* Dkt. 33 at 12. Jones has satisfied the first element of ERISA equitable estoppel.

**B.     Extraordinary Circumstances**

Extraordinary circumstances, the third ERISA-estoppel factor, generally require one or more of the following:

(1) acts of bad faith;
(2) attempts to actively conceal a significant change in the plan;
(3) the commission of fraud;
(4) circumstances where a plaintiff repeatedly and diligently inquired about benefits and was repeatedly misled; or
(5) an especially vulnerable plaintiff.

*Brown v. Aetna Life Ins. Co.*, 975 F. Supp. 2d 610, 625-26 (W.D. Tex. 2013). "In the absence of these or similar circumstances, an ERISA-estoppel claim may not proceed." *Id.* at 626; *see also Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 Fed. App'x 260, 266 (5th Cir. 2020) (per curiam) (noting that, while the Fifth Circuit has not specifically defined "extraordinary circumstances," it has recognized with approval the Third Circuit's approach generally defining extraordinary circumstances as "those that involve bad faith, fraud, or concealment, as well as possibly when 'a plaintiff repeatedly and diligently inquired about benefits and was repeatedly misled' or when 'misrepresentations were made to an especially vulnerable plaintiff'") (quoting *High v. E-Systems*, 459 F.3d at 580 n.3); *Belmonte v. Examination Mgmt. Servs.*, 730 F. Supp. 2d 603, 605 (N.D. Tex. 2010) (finding persuasive Third Circuit suggestion that "extraordinary circumstances may exist

where a plaintiff repeatedly and diligently inquired about benefits and was repeatedly misled") (citing *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996)).

Here, the record establishes that Jones "repeatedly and diligently inquired about benefits and was repeatedly misled." *Id.* As Jones stated in a call with Zucchi after Jones learned of the miscalculation:

> Jones: "So I understand that IBM says estimate, estimate, estimate all along, but, um, you know, I called so many times. I went back through my records and I have a list of all the times I called and got confirmation of the amount."
>
> Zucchi: "Right."
>
> Jones: "So it's very disturbing. How is a person to plan? You know, you're given a number for two years, and then, the day before the check is supposed to come, it changes dramatically."

Aug. 3, 2018 Call at 3:00-3:30.

In addition, the record shows that although IBM knew as many as 500 employees could receive erroneous calculations, the corrective action it chose permitted Jones to be misled repeatedly and consistently throughout her retirement planning process. The undisputed facts support a finding of extraordinary circumstances in an ERISA-estoppel case because Jones "repeatedly and diligently inquired about benefits and was repeatedly misled." *Brown*, 975 F. Supp. 2d at 626.

### C.   Reasonable and Detrimental Reliance

The remaining ERISA-estoppel element has two prongs: detrimental and reasonable reliance on the material misrepresentation.

#### 1.   Detrimental Reliance

Jones submitted evidence showing that she relied on IBM's misrepresentation to her detriment. She testified that she took early retirement based on the representation that her lump sum pension payment would be $331,250.95; had she known that it would be only $53,477.71, Jones testified, she would have continued working until age 70. Dkt. 32 at 76-77, Jones Tr. at 43:17-44:2. Jones

7

also testified that she is unable to secure employment due to her age and lack of skills. *Id.* at 99-100, Jones Tr. at 92:22-93:11. The Court finds that there is no genuine dispute as to any material fact concerning Jones's detrimental reliance on IBM's misstatements. *See High v. E-Systems*, 459 F.3d at 580 (finding that plaintiff relied to his detriment on disability benefits he received for six years without offset for Veterans Administration benefits).

### 2. Reasonable Reliance

The final determination is whether Jones's reliance on IBM's misstatements was reasonable. The Fifth Circuit has stated that a "party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party." *Id.* (quoting *Sprague v. GMC*, 133 F.3d 388, 404 (6th Cir. 1998)).

The facts here, however, do not fit neatly into the analysis of the cases on which IBM relies, such as *Mello* and *High v. E-Systems*. *See* Dkt. 33 at 13. In those cases, the plaintiff's claim amounted to "an argument that informal written and oral statements amended or modified the terms of the Plan." *Mello*, 431 F.3d at 446. In *Mello*, the plaintiff received benefit statements and oral representations that conflicted with the plan's definition of credited dates of service. *Id.* at 446 & n.5. In *High v. E-Systems*, 459 F.3d at 580, the unambiguous language of the E-Systems plan permitted benefits offset. This case is distinguishable in that Jones relied on calculations of her pension payout provided by IBM; there is no evidence that she was able to determine independently whether those calculations were at variance with the terms of the plan.

IBM asserts that Jones's reliance on informal benefit statements was not reasonable because they were inconsistent with plan documents available to her by requesting a manual calculation of her lump-sum payout. IBM points out that, in her February 2, 2018 conversation with Victoria Coyle, a member of IBM's Retirement Coordination Team, Jones noted that the lump sum estimate of $331,250.95 did not align with the cash value or annuity estimates in the benefit statements.

8

IBM accuses Jones of "willful ignorance" for declining when "offered the chance to clarify the benefit statements." Dkt. 37 at 6; *see also* Dkt. 33 at 14 n.58 ("Notably, Jones refused to obtain a manual (and more accurate) calculation when she was raising questions about the discrepancies in the 2018 Statement.").

The undersigned finds that genuine issues of material fact exist as to whether Jones can establish reasonable reliance. The February 2, 2018 call cited by IBM begins with Jones telling Coyle that Jones wants to confirm that she understands the numbers in her pension statements. Jones asks whether $331,250 is the amount she would take as a lump-sum payout. Coyle responds:

> "That is the estimated figure. We won't know the exact figure until after your employment status is updated and your final calculation is completed, but that's as close to the correct figure as we can get based on the information that IBM has provided to us. So it's a fairly accurate figure, but it may be just a bit off."
>
> Jones: "Okay, yeah, a few dollars and cents, okay. But it's basically $331,000 that I will take as a lump sum if I so choose, and that amount will transfer to the Fidelity account that I designate, right?"
>
> Coyle: "That's right."

Feb. 2, 2018 Call at 1:52-2:29, Dkt. 33-3.

Jones continues to ask questions, and Coyle says: "If you're looking for something more elaborate, we do have something called a detailed calculation that shows how those figures come about." Jones says "No" and continues asking questions about the calculations in the report, particularly examples of options for "splits," partial lump-sum payouts plus monthly annuity payments. *Id.* at 4:06-15. Jones asks why a customized example of her pension options for a 25% monthly annuity plus a 75% lump sum payment displays a lump sum payment of only $34,000.

> Jones: "My lump sum is $331,000, if I take the whole thing. 75% of $331,000—"
>
> Coyle: "That's not how it's calculated. So, and, let me elaborate a little bit further. So the 75% lump sum isn't 75% of $331,000 because it's also allowing you to take a monthly annuity for the rest

9

> of your life. And no one knows the mortality or when they're going to pass, so regardless of how long you live, whether it's 10 years or another 70 years, you're going to get that figure for the rest of your life."
>
> Jones: "Okay. Okay. So the 75% lump sum is not 75% of the $331,000 lump sum."
>
> Coyle: "Correct."
>
> Jones: "Okay. See, that is my question. That's the confusion. So it's based on some calculation?"
>
> Coyle: "That's right. Yes, so, it's based on mortality rates."
>
> Jones: "Hmm. Okay. Very strange. Okay. So none of those splits look attractive. So I will call you back with a final decision, but I'm leaning towards the lump-sum distribution, and I just want to confirm one more time that the $331,000 is the lump sum amount and that would transfer to my Fidelity account if I take it as a distribution."
>
> Coyle: "So it is the estimated figure, not the exact figure, but yes, it is as close to the correct figure as we can get based on the information that we've been provided."

*Id.* at 6:43-8:26. Jones concludes by saying that she will call back with her election, thanks Coyle, and tells her that "it really made a difference to understand these calculations." *Id.* at 8:32-36.

Thus, Jones asked for, and received, an explanation of discrepancies in the benefit statements. There is no evidence that Jones believed the lump-sum estimate was erroneous, or that a manual calculation would differ significantly from the $331,250.95 estimate she confirmed repeatedly.

IBM also contends that it was not reasonable for Jones to believe that she was entitled to a benefit of more $330,000 based on just four years of contributions to the pension plan, when her payout the first time she left IBM – after 19 years of work – was only $89,000. Jones responds that she believed her pension distribution would be larger because she earned a much higher salary during her second tenure with IBM, and also believed that the pension fund's investment experience was better, given the state of the financial markets following her rehire.

10

Taken as a whole, the evidence raises genuine issues of material fact as to whether Jones's reliance on IBM's misrepresentation was reasonable. At trial, the Court will have the opportunity to weigh the evidence and assess the credibility of all witnesses to determine whether Jones has met the reasonable reliance requirement to prevail on her ERISA-estoppel claim.

**D.     Damages**

Finally, the parties dispute whether the relief Jones seeks – a monetary award of $277,773.24 – is available in an ERISA-estoppel cause of action. IBM argues that ERISA estoppel arises under ERISA § 502(a)(3), which limits recovery to "other appropriate equitable relief."[3] Dkt. 37 at 6. Because she seeks the legal remedy of compensatory damages and not an equitable remedy, IBM argues, Jones's claim "is in reality a claim under Section 502(a)(1) for an improper denial of benefits." *Id.* at 6 & n.12. Jones responds that "this case does not involve a claim for relief brought pursuant to section 502(a)(3)," Dkt. 36 at 16, even though she states in her Complaint that she "brings her claim for ERISA estoppel pursuant to 28 U.S.C. §1132(a)(3)(B)(i)."[4] Dkt. 1 ¶ 40.

Jones has the better of the argument as to the relief available in an ERISA-estoppel action. As Judge Cardone wrote in *Brown*, "courts have suggested that the ERISA-estoppel 'doctrine does not appear to be tied to the equitable relief provisions of § 1132(a)(3).'" *Brown*, 975 F. Supp. at 625 (quoting *Khan v. Am. Int'l Grp., Inc.*, 654 F. Supp. 2d 617, 629 n.6 (S.D. Tex. 2009)). Instead, ERISA estoppel may be construed as a federal common-law remedy. *See id.* at 625 n.15; *see also Mello*, 431 F.3d at 444 & n.3 (explaining that "courts are to develop a 'federal common law of

---

[3] ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)(B)(i), provides that: "A civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations."

[4] Jones also cites Title 28 of the United States Code, rather than Title 29, in her and Motion (Dkt. 31 at 1), but these appear to be typographical errors. In the introductory paragraph to her Complaint, Jones states that she files her complaint "pursuant to 29 U.S.C. § 1132(a)." Dkt. 1 at 1.

rights and obligations under ERISA-regulated plans'") (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989)); *Brennan v. HCA, Inc. Health & Welfare Benefits Plan*, No. SA-15-CA-276-XR, 2016 WL 11578834, at *3 (W.D. Tex. Feb. 29, 2016) (quoting *Mello*); *Mora v. Albertson's, L.L.C.*, No. EP-15-CV-00071-FM, 2015 WL 3447963, at *4 (W.D. Tex. May 28, 2015) ("As the Fifth Circuit has implied ERISA estoppel claims are based on common law rather than pursuant to section 1132(a)(3), an analysis under section 1132(a)(3) is not warranted.").

Even if Jones's ERISA-estoppel claim arises under § 502(a)(3) rather than federal common law, subsequent to the cases on which IBM relies, the Supreme Court held in *Amara* that an award of make-whole relief can be appropriate under § 502(a)(3). The Court reasoned that equity courts could provide relief for a loss in the form of monetary compensation sometimes called a "surcharge." 563 U.S. at 442. Applying *Amara*, in *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448 (5th Cir. 2013), the Fifth Circuit reversed the dismissal of claims for compensatory money damages under § 502(a)(3) and equitable estoppel. The plaintiff alleged that he had been induced to take early retirement by his employer's promise to provide him with health care benefits, based on the employer's incorrect calculation of his years of service. *Gearlds*, 709 F.3d at 449. The Fifth Circuit explained that: "Until recently, it was accepted in this and other circuits that 'other appropriate equitable relief' was limited to the kinds of remedies typically available at equity, such as injunctions, mandamus, or restitution, and that so-called 'make-whole' monetary damages were not within the scope of the statute." *Id.* at 450. In light of *Amara*, however, the Fifth Circuit found that the plaintiff's § 502(a)(3) complaint was viable. *Id.* at 452. More relevant here, because the *Gearlds* court found that "relief is available under the surcharge doctrine under *Amara*," it did not address the equitable estoppel claim, stating that the district court "is free to consider that claim on remand." *Id.* at 453.

For these reasons, IBM has not established that it is entitled to judgment as a matter of law that the relief Jones seeks is unavailable under an ERISA-estoppel theory.

## IV. Recommendation

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the District Court **DENY** both Plaintiff's Motion for Summary Judgment (Dkt. 31) and Defendant's Motion for Summary Judgment (Dkt. 33).

**IT IS FURTHER ORDERED** that this case be removed from the Magistrate Court's docket and returned to the docket of the Honorable Robert Pitman.

## V. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on November 15, 2020.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE